# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MARK KRONFELD, solely in his capacity as Litigation Trustee for the HERITAGE POWER LITIGATION TRUST, REORGANIZED HERITAGE POWER TOPCO, LLC, HERITAGE POWER, LLC, and SHAWVILLE POWER, LLC,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>GENON HOLDINGS, INC., GENON HOLDINGS, LLC, GENON ENERGY SERVICES, LLC, STRATEGIC VALUE PARTNERS, LLC, STRATEGIC VALUE SPECIAL SITUATIONS FUND IV, L.P., DAVID FREYSINGER, DARREN OLAGUES, HOLLY ANDERSON, STEPHEN SCHAEFER, PHILIP BROWN, ARI BARZIDEH A/K/A ARI BARZ, DAVID GEENBERG, and EUGENE DAVIS,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 2025-1368-BWD<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION
## PARTIALLY RESOLVING MOTION TO DISMISS

Date Submitted: July 17, 2026
Date Decided: August 6, 2026

William M. Lafferty, Ryan D. Stottmann, C. Isaac Hopkin, Elaine M. McCabe, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; OF COUNSEL: Silpa Maruri, Michael Duke, Brian Campbell, Alexander S. Davis, Angel Valle, Chase Shelton, ELSBERG BAKER & MARURI PLLC, New York, NY; *Attorneys for Plaintiffs Mark Kronfeld, solely in his capacity as Litigation*

*Trustee for the Heritage Power Litigation Trust, Reorganized Heritage Power TopCo, LLC, Heritage Power, LLC, and Shawville Power, LLC.*

Elena C. Norman, Jason W. Rigby, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; OF COUNSEL: Elliot Moskowitz, Nicholas D'Angelo, DAVIS POLK & WARDWELL LLP, New York, NY; *Attorneys for Defendants GenOn Holdings, Inc., GenOn Holdings, LLC, GenOn Energy Services, LLC, Strategic Value Partners, LLC, Strategic Value Special Situations Fund IV, L.P., David Freysinger, Darren Olagues, Holly Anderson, Stephen Schaefer, Philip Brown, Ari Barzideh a/k/a Ari Barz, David Geenberg, and Eugene Davis.*

**DAVID, V.C.**

The corporate defendants in this action indirectly own several limited liability companies, including one that leases the Shawville Generation Station, a natural-gas power plant in Clearfield County, Pennsylvania, previously owned by a subsidiary of power supply company Public Service Enterprise Group ("PSEG"). As the facility lessee, the subsidiary held a right of first offer to purchase the plant if PSEG decided to sell during the term of the lease. As alleged, the subsidiary became insolvent and its parent companies negotiated with PSEG to purchase the plant at a bargain price. The subsidiary's board of directors voted to waive the right of first offer and the parent companies' affiliate acquired the plant.

A litigation trust and another entity formed in bankruptcy that holds preserved claims on behalf of creditors have challenged the decision to waive the right of first offer. The complaint asserts eleven counts, including two claims for tortious interference with business relations, four claims for breach of fiduciary duty, and claims for civil conspiracy, fraudulent transfer, corporate waste, unjust enrichment, and conversion. This decision dismisses the claims for tortious interference, one aspect of one claim for breach of fiduciary duty, and claims for fraudulent transfer and corporate waste. The remaining counts will be addressed in a subsequent ruling.

1

## I. BACKGROUND[1]

### A. Reliant Sells The Shawville Plant To PSEG And Leases It Back.

The Shawville Generation Station (the "Shawville Plant") is a natural-gas power plant located in Clearfield County, Pennsylvania. Compl. ¶ 42.

In May 2000, nonparty Reliant Energy, Inc. ("Reliant") purchased the Shawville Plant. *Id.* ¶ 43. Later that year, to obtain financing, Reliant entered into a sale-and-leaseback transaction (the "Leaseback Transaction") with affiliates of power supply company PSEG. *Id.* ¶ 44. In the Leaseback Transaction, Reliant sold the Shawville Plant to PSEG and the parties agreed that Reliant would lease the Shawville Plant back from PSEG. *Id.* ¶¶ 8, 44.

To effectuate the Leaseback Transaction, Reliant and PSEG entered into a "Participation Agreement" and a "Facility Lease." *See id.*, Ex. 1 [hereinafter Participation Agt.]; Compl. ¶ 44. The Participation Agreement identified PSEG's affiliate, PSEGR Shawville Generation, LLC, as the "Owner Participant"; PSEG's indirect subsidiary, Shawville Lessor Genco, LLC, as the "Owner Lessor"; and Reliant as the "Facility Lessee." Compl. ¶ 45; Participation Agt. at 1.

---

[1] The following facts are taken from the Verified Complaint (the "Complaint") and the documents incorporated by reference therein. Verified Compl. [hereinafter Compl.], Dkt. 1.

2

The Participation Agreement granted the Facility Lessee a right of first offer ("ROFO") to purchase the Shawville Plant if PSEG decided to sell the plant during the term of the lease:

> [PSEG's affiliate] must first offer to sell such Member Interest [of the Shawville Plant] to the Facility Lessee on the terms and conditions set forth in this Section 15.1. Such offer shall be made to the Facility Lessee in the form of a proposed term sheet, which proposed term sheet shall include an outline of the price and reasonably detailed outline of all of the material terms, conditions and provisions upon which [PSEG's affiliate] would be willing to transfer its interest in the Member Interest [of the Shawville Plant].

Participation Agt. § 15.1.

## B. GenOn Acquires Reliant.

Ten years after the Leaseback Transaction, in 2010, a Reliant subsidiary merged with another company to form GenOn Energy, Inc. ("GenOn Energy"), which was then acquired by nonparty NRG Energy, Inc. ("NRG"). Compl. ¶¶ 52–53. GenOn Energy, controlled by NRG, became the Facility Lessee. *See id.* ¶ 53.

## C. SVP Acquires A Majority Equity Interest In GenOn In Bankruptcy.

NRG caused GenOn Energy to file for bankruptcy in June 2017. *Id.* ¶ 56. In December 2018, a new corporate group, "GenOn," emerged from bankruptcy to carry on GenOn Energy's business under a plan of reorganization. *Id.* ¶ 57. The plan of reorganization created a new corporate structure for GenOn. At the top of the organization chart sits GenOn Holdings, Inc., which owns GenOn Holdings,

3

LLC, which in turn owns GenOn Energy Services, LLC ("GES"). *Id.* ¶¶ 24–26, 28, 65. GenOn Holdings, Inc. is owned by GenOn Energy's former bondholders. *Id.* ¶¶ 21, 57. The bondholders included defendant Strategic Value Partners, LLC ("SVP LLC"), an investment manager that controls Strategic Value Special Situations Fund IV, L.P. ("SVSS IV," and with SVP LLC, "SVP"). *Id.* ¶¶ 22–23. SVP, through funds including SVSS IV, owned a majority of GenOn's equity. *Id.* ¶ 57.

GenOn took over the Shawville Plant's operations, and its wholly owned subsidiary, NRG REMA LLC, became the Facility Lessee under the Participation Agreement. *Id.*

After the reorganization, SVP installed new directors and officers throughout GenOn's corporate structure, including by appointing defendants David Geenberg, Ari Barz, David Freysinger, Stephen Schaefer, Philip Brown, and Alejandro Mazier[2] (collectively, the "Manager Defendants") to GenOn's board of directors. Compl. ¶ 58. Defendant Darren Olagues was also appointed to GenOn's board. *Id.*

---

[2] Though initially named as a "Manager Defendant," Mazier passed away and was voluntarily dismissed from the case on February 27, 2026. Dkt. 8.

**D. GenOn Conveys Its Right To Operate The Shawville Plant To Its Heritage Subsidiaries.**

Through additional restructuring transactions, GenOn conveyed a portion of its power plant assets to newly created wholly owned corporate subsidiaries: Heritage Power Holdings, LLC ("Heritage Power Holdings"), which owned Heritage Power Intermediate Holdings, LLC ("Heritage Intermediate"), which in turn owned Heritage Power, LLC ("Heritage Power"), which in turn owned Shawville Power, LLC ("Shawville Power," and together with Heritage Intermediate and Heritage Power, the "Heritage Companies"). *Id.* ¶¶ 61, 65. After the restructurings, Shawville Power possessed the rights and obligations of the Facility Lessee under the Participation Agreement. *Id.* ¶¶ 66, 88–89. Each of the Manager Defendants was appointed to Heritage Intermediate's board of managers (the "Board"). *Id.* ¶¶ 29, 32, 33, 34, 35, 36. Olagues served as a Vice President and Treasurer and defendant Holly Anderson served as a Vice President and Secretary for the Heritage Companies. *Id.* ¶¶ 30–31.

**E. The Heritage Companies Enter Into A Credit Agreement With Lenders.**

On July 30, 2019, the Heritage Companies entered into a Credit and Guaranty Agreement (the "Credit Agreement") with several lenders (the "Lenders"). *Id.*, Ex. 2 [hereinafter Credit Agt.]; Compl. ¶ 63. Under the Credit Agreement, the Lenders provided a $520 million term loan facility to Heritage Power as the borrower, with

5

Heritage Intermediate as the pledgor and Shawville Power and other subsidiaries as guarantors. Compl. ¶¶ 63–64; Credit Agt. at 1.[3]

Section 8.11 of the Credit Agreement restricts "Loan Parties,"[4] including Heritage Power and Shawville Power, from "enter[ing] into or caus[ing] or permit[ting] to exist any arrangement, transaction, or contract (including for the purchase, lease, or exchange of property or the rendering of services) with any of its other Affiliates[5] . . . ." Credit Agt. § 8.11. This restriction is subject to exceptions, such as if a transaction is "on fair and reasonable terms no less favorable to such Loan Party (or such Subsidiary) than it could obtain in an arm's length transaction[.]" *Id.* § 8.11(a).

After the restructurings described above and entry into the Credit Agreement, the corporate structure of SVP, GenOn, and the Heritage Companies was as follows:

---

[3] Jefferies Finance LLC serves as the "Administrative Agent" under the Credit Agreement. Credit Agt. at 1.

[4] *See* Credit Agt. § 1.1 (defining "Loan Party" to include the "Borrower" and each "Subsidiary Guarantor"); *id.* (defining "Subsidiary Guarantor" as "each Generation Portfolio Company . . . and each other direct and indirect, wholly[] owned, existing and future domestic Subsidiary of the Borrower"); *id.* (listing "Shawville Power" as a "Generation Portfolio Company"); *id.* at 1 (defining Heritage Power as the "Borrower"); *see also* Compl. ¶ 208.

[5] The Credit Agreement defines "Affiliate" to mean "any other Person which, directly or indirectly, Controls, is Controlled by or is under common Control with such Person." Credit Agt. § 1.1.



Compl. ¶ 65.

## F.     The Heritage Companies' LLC Agreements

Heritage Intermediate, Heritage Power, and Shawville Power are governed by similar limited liability company agreements (collectively, the "LLC Agreements"). Compl., Exs. 3–5 [hereinafter the "LLC Agts."].[6]

---

[6] The relevant provisions in each LLC Agreement are substantially similar, but Heritage Intermediate is managed by a board of managers while Heritage Power and Shawville Power are member-managed. *See* Compl., Exs. 3–5. For convenience, this decision refers to them collectively as the LLC Agreements when their provisions do not differ.

The LLC Agreements include "Special Purpose Provisions" to protect the rights of the Heritage Companies' creditors until the loan under the Credit Agreement is repaid. One Special Purpose Provision is reflected in Section 7(c), which states:

> Notwithstanding any other provision of this Agreement or any other document governing the formation, management or operation of the Company, and notwithstanding any provision of law so empowering the Company, the Member, the Board, or any other Person, until the loan is indefeasibly repaid in full, neither the Member, the Board nor any other Person shall be authorized or empowered on behalf of the Company to, nor shall they permit the company to, and the Company shall not, in each case, without the prior written consent of the Member, and the prior unanimous written consent of the Board (including the Independent Manager), take any Material Action with respect to the Company[.]

LLC Agts. § 7(c).

The LLC Agreements define a "Material Action" to include "enter[ing] into [a] material intercompany relationship[] with any Affiliate of the Company other than the Company's direct or indirect subsidiaries" or "tak[ing] any action in furtherance of any of the foregoing . . . ." *Id.*, Sched. A.

The LLC Agreements provide that "the Independent Manager shall consider only the interests of the Company, including its creditors, in acting or otherwise voting on the matters referred to in Section 7(b) and Section 7(c) of this Agreement or for which an act or vote of the Independent Manager is otherwise required hereunder." *Id.* § 8. Heritage Intermediate's LLC Agreement further states that

8

"other than in connection with the matters requiring the vote of the Independent Manager . . . the Independent Manager shall not participate in Board meetings or have the power to vote on matters not requiring the vote of the Independent Manager[.]" Compl., Ex. 3 § 8. Each LLC Agreement designates nonparty Steven Pully as the "Independent Manager." LLC Agts. at 1.

## G. The Heritage Companies Become Insolvent.

By 2020, the Shawville Plant was the most productive power plant in the Heritage Companies' portfolio, accounting for nearly 60% of the energy generated and sold in 2022. Compl. ¶¶ 9, 84, 115.

On December 16, 2020, Shawville Power and PSEG amended the Participation Agreement to extend Shawville Power's lease through November 2031. *Id.* ¶ 88.

Although the Shawville Plant was profitable, by February 2022, the Heritage Companies were insolvent. *Id.* ¶ 102; *see also id.* ¶¶ 91–101. Between May and September, SVP and GenOn prepared for a restructuring while negotiating with an "ad hoc" group of Lenders (the "Ad Hoc Group"). *Id.* ¶¶ 110–11.

## H. SVP And GenOn Execute A Term Sheet With PSEG To Purchase The Shawville Plant.

According to the Complaint, at some point in 2022, SVP and GenOn entered into discussions with PSEG about purchasing the Shawville Plant. *Id.* ¶ 128. As alleged, GenOn and SVP knew that PSEG would sell the Shawville Plant for less

9

than market value because PSEG had largely divested its fossil fuel generation portfolio and the Heritage Companies' impending bankruptcy cast doubt on the future of the Shawville Plant lease.  *See id.* ¶¶ 126–27.

At some point, SVP, GenOn, and the Manager Defendants offered PSEG an alleged "bargain price" to purchase the Shawville Plant.  *Id.* ¶ 129.  Olagues and Anderson allegedly were "intimately involved in these negotiations."  *Id.* ¶ 132.  PSEG ultimately agreed to sell the Shawville Plant for $20 million.  *See id.* ¶ 130.

## I.  SVP Appoints A New Manager And The Board Votes To Cause Shawville Power To Waive The ROFO.

As the Facility Lessee under the Participation Agreement, Shawville Power retained a ROFO to purchase the Shawville Plant if PSEG decided to sell it.  *Id.* ¶ 132; Participation Agt. § 15.1.  Sometime in November, Anderson, who served as both GenOn's general counsel and corporate secretary for each of the Heritage Companies, emailed outside counsel to coordinate a "Heritage board meeting for late Friday [December 2, 2022] to waive the ROFO on the Shawville Transaction."  Compl. ¶ 137 (emphasis omitted) (alteration in original).

On December 1, SVP appointed defendant Eugene Davis to the Board.  *Id.* ¶ 139.  On the morning of December 2, Anderson held an introductory call with Davis to provide him with background on Heritage Intermediate.  *Id.* ¶ 142.

The same morning, defendants Brown, Barz, and Geenberg resigned from the Board.  *Id.* ¶ 141.

The remaining managers on the Board—Freysinger, Mazier, Schaefer (collectively, the "Remaining Managers"), and Davis—held a meeting on the evening of December 2. *Id.* ¶ 146. In advance of the call, Anderson circulated a 5-page "summary of material terms" of the Shawville Plant transaction, noting that she did not "plan to review them in depth at the meeting other than the purchase price and indemnity/parent guaranty requirements." *Id.* ¶ 143 (emphasis omitted). The materials explained: "Gen[O]n is interested in purchasing PSEGR and the Shawville Facility, through its wholly owned-subsidiary Genon Energy Services, LLC ('GES'). If GES purchases PSEGR and the Shawville Facility from PSEG, it is anticipated that GES would step into the shoes of PSEGR under the Shawville Leases." *Id.* ¶ 147.

The materials also included management's recommendation that, "[b]ased on Heritage's current financial situation, including its constrained liquidity and its anticipated default under its first lien credit facility as early as the first quarter of 2023, and the proposed purchase price for PSEGR [the indirect owner entity of the Shawville Plant], it is management's recommendation that Heritage direct Shawville Power to waive its right of first offer with respect to the acquisition of PSEGR." *Id.* ¶ 148 (alteration in original).

11

At the meeting, the Board voted to cause Shawville Power to waive the ROFO to acquire the Shawville Plant (the "December 2 Board Vote"). *Id.* ¶ 151. The Independent Manager was not notified of the meeting and did not vote. *Id.* ¶ 138.

Later that evening, GES, GenOn Holdings, LLC, and PSEG entered into a Membership Interest Purchase and Sale Agreement through which GES acquired PSEG's ownership interests in the Owner Lessor of the Shawville Plant (the "Shawville Acquisition"). *Id.* ¶ 152; Defs.' Opening Br. in Supp. of Their Mot. to Dismiss [hereinafter DOB], Ex. A, Dkt. 7.

The next day, December 3, SVP and GenOn informed the Ad Hoc Group of the Shawville Acquisition. Compl. ¶ 156. The Ad Hoc Group responded with a term sheet to finance Shawville Power's exercise of the ROFO. *Id.* ¶¶ 159–60.

The Shawville Acquisition closed on March 28, 2023. *Id.* ¶ 169.

**J.      The Parties Sign A Claims Preservation Agreement And The Heritage Companies Enter Bankruptcy.**

On January 24, 2023, SVP, GenOn, and the Lenders entered into a Claims Preservation Agreement ("CPA") that preserved "any claims or causes of action existing on the date hereof held by the Administrative Agent for the benefit of the Lenders against GenOn arising out of or in connection with the Shawville Acquisition." *Id.* ¶ 166; Compl., Ex. 7, Ex. B [hereinafter CPA] § 1. The CPA does not preserve "(i) any Heritage Claims or any claims or causes of action belonging to any other person or entity that is not the Administrative Agent as of the date hereof

12

or (ii) any Heritage Claims that may now or in the future be asserted derivatively by any entity." CPA § 1. The CPA defines "Heritage Claims" to mean "any claims or causes of action that belong to, or could be asserted by, Heritage or its bankruptcy estates whether through a trustee or debtor-in-possession or otherwise." *Id.*

The same day, the Heritage Companies filed for Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Southern District of Texas. Compl. ¶ 168.

On September 30, the Heritage Companies filed an amended Chapter 11 plan, which provided for the creation of a litigation trust to receive the claims preserved under the CPA. *Id.* ¶ 170. Pursuant to the plan, plaintiff Heritage Power Litigation Trust (the "Litigation Trust") was formed. *Id.* ¶¶ 17, 167, 170.

On October 4, the U.S. Bankruptcy Court for the Southern District of Texas approved Heritage's plan of reorganization (the "Plan"). *Id.* ¶¶ 168, 171. The Plan released the Heritage Companies' claims against Defendants except for claims "arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, gross negligence or willful misconduct, each solely to the extent determined by a Final Order of a court of competent jurisdiction . . . ." DOB, Ex. B § X.E.1. The Plan vested the preserved claims in Reorganized Heritage Power TopCo, LLC (with Heritage Power and Shawville Power, the "Heritage Plaintiffs"), Heritage Intermediate's successor-in-interest. Compl. ¶¶ 17, 173.

On April 15, 2025, Plaintiffs made a demand on GenOn Holdings, LLC to turn over the Heritage Companies' pre-petition books and records, which GenOn refused to hand over. *Id.* ¶¶ 177–78.

**K. Procedural History**

On November 24, Plaintiffs initiated this action through the filing of the Complaint. Dkt. 1. The Complaint asserts eleven counts:

- In Count I, the Litigation Trust brings a claim against SVP, GenOn, the Manager Defendants, Olagues, and Anderson for tortious interference with the LLC Agreements. Compl. ¶¶ 181–206.

- In Count II, the Litigation Trust brings a claim against SVP, GenOn, the Manager Defendants, Olagues, and Anderson for tortious interference with the Credit Agreement. *Id.* ¶¶ 207–17.

- In Count III, the Heritage Plaintiffs allege a claim against the Manager Defendants, Olagues, and Anderson for breach of fiduciary duty. *Id.* ¶¶ 218–25.

- In Count IV, the Heritage Plaintiffs allege a claim against Davis for breach of fiduciary duty. *Id.* ¶¶ 226–31.

- In Count V, the Heritage Plaintiffs allege a claim against SVP and GenOn for breach of fiduciary duty. *Id.* ¶¶ 232–39.

- In Count VI, the Heritage Plaintiffs allege an alternative claim against SVP and GenOn for aiding and abetting breach of fiduciary duty. *Id.* ¶¶ 240–48.

- In Count VII, the Heritage Plaintiffs allege an alternative claim against SVP and GenOn for civil conspiracy. *Id.* ¶¶ 249–56.

- In Count VIII, the Litigation Trust asserts a claim against GES for fraudulent transfer. *Id.* ¶¶ 257–69.

- In Count IX, Reorganized Heritage Power TopCo, LLC[7] alleges a claim against the Manager Defendants and Olagues for corporate waste. *Id.* ¶¶ 270–75.

- In Count X, the Heritage Plaintiffs allege an alternative claim against GES for unjust enrichment. *Id.* ¶¶ 276–82.

- In Count XI, the Heritage Plaintiffs allege a claim against GenOn Holdings, LLC for conversion. *Id.* ¶¶ 283–86.

---

[7] The Complaint lists Heritage Intermediate as the Plaintiff asserting this claim, but that entity was succeeded by Reorganized Heritage Power TopCo, LLC. Compl. ¶ 18.

15

On January 30, 2026, Defendants moved to dismiss the Complaint (the "Motion to Dismiss"). Dkt. 6. The parties completed briefing on the Motion to Dismiss on March 30.[8] The Court heard oral argument on July 17. Dkt. 29.

## II. ANALYSIS

Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim. When reviewing a motion to dismiss under Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

Defendants raise myriad arguments in support of their Motion to Dismiss the eleven counts of the Complaint. This memorandum opinion addresses Counts I and II, Count III only to the extent it alleges breaches of the duty of candor, and Counts VIII and IX. A separate ruling on the remaining counts will follow.

---

[8] *See* DOB; Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss [hereinafter PAB], Dkt. 10; Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss [hereinafter DRB], Dkt. 15.

**A. Counts I And II Fail To State Claims For Tortious Interference Because Waiving The ROFO Was Not A "Material Action" Under The LLC Agreements.**

Counts I and II allege claims against SVP, GenOn, the Manager Defendants, Olagues, and Anderson for tortious interference with the LLC Agreements and the Credit Agreement.

"A claim for tortious interference with business relations requires: '(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury.'" *Khan v. Warburg Pincus, LLC*, 2025 WL 1251237, at *10 (Del. Ch. Apr. 30, 2025) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1266–67 (Del. 2004)), *aff'd*, 351 A.3d 493 (Del. 2025) (TABLE). "An underlying contractual breach is a necessary factor." *Id.*

When interpreting a contract to evaluate a potential breach, Delaware courts adhere to the objective theory of interpretation, assigning "unambiguous contract provisions or terms their plain meaning." *Schwan's Home Serv., Inc. v. Microwave Sci., JV, LLC*, 2013 WL 3350881, at *5 (Del. Super. Ct. June 24, 2013). A contractual provision is ambiguous only "if it is susceptible to more than one reasonable interpretation." *Terrell v. Kiromic Biopharma, Inc.*, 338 A.3d 1272, 1276–77 (Del. 2025) (quoting *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261

17

A.3d 1199, 1208 (Del. 2021)). "An interpretation is unreasonable if it 'produces an absurd result[.]'" *Id.* at 1277 (quoting *Manti*, 261 A.3d at 1208).

Plaintiffs base their tortious interference claims on two alleged breaches. First, Plaintiffs argue that the December 2 Board Vote to cause Shawville Power to waive the ROFO constituted a Material Action under the LLC Agreements, triggering the Independent Manager's approval right. *See* PAB at 24 (arguing that "rejecting the ROFO without the Independent Manager's consent breached the [LLC Agreements]"). The LLC Agreements define a "Material Action" to include "enter[ing] into [a] material intercompany relationship[] with any Affiliate of the Company other than the Company's direct or indirect subsidiaries" or "tak[ing] any action in furtherance of any of the foregoing." LLC Agts., Sched. A. Plaintiffs argue that "[d]eclining the ROFO created a lessor-lessee relationship between GES—a Heritage affiliate—and Shawville Power," and that the Heritage Companies breached their respective LLC Agreements by failing to permit the Independent Manager to vote on that decision. PAB at 24. Second, Plaintiffs argue that the December 2 Board Vote breached Section 8.11 of the Credit Agreement, which prohibits a Loan Party from "enter[ing] into or caus[ing] or permit[ting] to exist any arrangement, transaction, or contract (including for the purchase, lease, or exchange of property or the rendering of services) with any of its other Affiliates . . . ." Credit Agt. § 8.11. Plaintiffs argue that "[r]ejecting the ROFO created and permitted a

18

contractual relationship between Heritage and its affiliate, GES," by clearing the way for the Shawville Acquisition. PAB at 25–26. Defendants deny that the December 2 Board Vote constituted a Material Action under the LLC Agreements or breached the Credit Agreement because "[the] Heritage [Companies] did not enter into any transaction with GenOn when it waived the ROFO, it only elected not to enter into a transaction with PSEG." DOB at 22.

The Complaint fails to allege a cognizable breach of the LLC Agreements because it is not reasonably conceivable that the December 2 Board Vote constituted a Material Action. The December 2 Board Vote was not an "action in furtherance of" an intercompany relationship—it was a decision *not* to take a particular action. Accepting Plaintiffs' argument that voting to waive the ROFO constituted a Material Action would lead to absurd results. If Plaintiffs are correct that the December 2 Board Vote was a Material Action, then the "prior unanimous written consent of the Board (including the Independent Manager)" was required to cause Shawville Power to waive the ROFO. LLC Agts. § 7(c). Under that interpretation, if the Independent Manager did not consent, then the Board could not waive the ROFO—in effect meaning that the Independent Manager could unilaterally compel Shawville Power to exercise the ROFO. That result is not a reasonable interpretation of the Special Purpose Provisions in the LLC Agreements. Those provisions are negative covenants that restrict the Heritage Companies from taking certain significant

19

actions without the Independent Manager's consent; they do not authorize the Independent Manager to unilaterally compel the Heritage Companies to enter into transactions. *See All. Data Sys. Corp. v. Blackstone Cap. P'rs V L.P.*, 963 A.2d 746, 766 (Del. Ch. 2009) (explaining that "negative covenants forbid action" and "liability under a negative covenant can only arise from an action"), *aff'd*, 976 A.2d 170 (Del. 2009) (TABLE); *see also Quarum v. Mitchell Int'l, Inc.*, 2020 WL 351291, at *3 (Del. Super. Ct. Jan. 21, 2020) ("Because liability from a negative covenant only arises from action, all allegations that the bound party failed to do certain things cannot state a breach of a negative covenant." (footnote omitted)).[9]

---

[9] The Complaint also alleges that SVP, GenOn, the Manager Defendants, Olagues, and Anderson breached the implied covenant of good faith and fair dealing in the LLC Agreements by "fail[ing] to exercise their discretion in good faith" and "caus[ing] Shawville Power to reject the ROFO to intentionally poach Heritage's opportunity to purchase the Shawville Plant to the detriment of the Lenders." PAB at 27; Compl. ¶¶ 200–04. The implied covenant does not require loyalty to a contractual counterparty; it requires a party to act consistently with the terms and purpose of their agreement. *Calumet Cap. P'rs LLC v. Victory Park Cap. Advisors, LLC*, 353 A.3d 88, 127 (Del. Ch. 2026). The parties to the LLC Agreements here specifically contemplated the circumstances in which the Board would and would not be permitted to take actions impacting the rights of the Lenders. "The implied covenant of good faith and fair dealing cannot properly be applied to give the [P]laintiffs contractual protections that 'they failed to secure for themselves at the bargaining table.'" *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 816 (Del. 2013) (quoting *Aspen Advisors*, 861 A.2d at 1260). When sophisticated parties bargain for bespoke protections, that "explicitly indicates that the parties were proceeding carefully to only delimit the issuer's freedom in a discrete manner" and "there is no role for the judiciary to imply other terms." *See Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1034 (Del. Ch. 2006).

20

The Complaint also fails to allege a cognizable breach of the Credit Agreement. Declining to exercise the ROFO did not "enter into" or "cause" the lessor-lessee relationship between GES and Shawville Power. That contractual relationship was not created or caused by the Board's decision to waive the ROFO, but by GES's entry into an agreement with PSEG. Plaintiffs nevertheless argue that by not exercising the ROFO, the Board "permit[ted]" an affiliate transaction "to exist." PAB at 25 (quoting Credit Agt. § 8.11). But if Plaintiffs' interpretation of the Credit Agreement is correct, Section 8.11 would have affirmatively required the Board to exercise the ROFO to acquire a $20 million asset in order to *prevent* an affiliate transaction. Again, that is not a reasonable reading of Section 8.11, which contains negative covenants restricting parties to the Credit Agreement from taking certain actions but does not require them to affirmatively engage in transactions.

Because Plaintiffs fail to allege a cognizable breach of the LLC Agreements or the Credit Agreement, their tortious interference claims in Counts I and II must be dismissed.

**B.    Count III Fails To State A Claim For Breach Of The Duty Of Candor.**

Count III of the Complaint alleges, in part, that the Manager Defendants breached their fiduciary duty of candor "by failing to disclose to the Independent Manager that PSEG had triggered Shawville Power's [ROFO] on the Shawville Plant." Compl. ¶ 223.

21

As the parties have briefed the issue, this claim rises and falls on the Court's decision on whether a Material Action was taken. *See* DOB at 38 ("Having determined that the waiver of the ROFO did not constitute a 'material action' under the [LLC Agreements], the [Manager Defendants] had no reason to inform the Independent Manager that the vote was occurring."); PAB at 53 n.23 (defending the duty of candor claim on the grounds that "waiving the ROFO was . . . a 'material action'"); DRB at 27.

Heritage Intermediate's LLC Agreement states that "other than in connection with the matters requiring the vote of the Independent Manager . . . the Independent Manager shall not participate in Board meetings or have the power to vote on matters not requiring the vote of the Independent Manager." Compl., Ex. 3 § 8. As set forth above, the December 2 Board Vote was not a Material Action and the Independent Manager therefore was not permitted to attend the Board meeting or vote with the Board.

Plaintiffs' duty of candor claim is therefore dismissed.

## C. Count VIII Fails To State A Claim For Fraudulent Transfer.

Count VIII of the Complaint asserts a claim against GES under the Delaware Uniform Fraudulent Transfer Act ("DUFTA"). Compl. ¶¶ 260, 268.

"To maintain a cause of action for fraudulent transfer, [a] [p]laintiff must show that [a] transfer was made . . . [:] '(1) with actual intent to hinder, delay or

22

defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation[.]'" *Seiden v. Kaneko*, 2015 WL 7289338, at *13 (Del. Ch. Nov. 3, 2015); *see also* 6 *Del. C.* § 1304(a).

Count VIII fails to state a claim for fraudulent transfer because the Complaint does not allege that any "transfer was made." The DUFTA defines a "transfer" to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." *Lake Treasure Hldgs., Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *13 (Del. Ch. Oct. 10, 2014) (quoting 6 *Del. C.* § 1301(12)). The Complaint at most alleges the dissipation or loss of an asset, which is not a "transfer" to another party, despite the broad statutory definition.

Plaintiffs allege that by waiving the ROFO, the Board transferred "the right to purchase the Shawville Plant on below-market terms" to GES. Compl. ¶ 260; *see also id.* ¶ 267 (alleging the Board transferred "the right to purchase the Shawville Plant from Shawville Power to GES"). To support this argument, Plaintiffs cite *William T. Reid, IV, PLLC v. Claudio Del Vecchio*, a decision sustaining a fraudulent transfer claim premised on allegations that the board of an insolvent company assigned a right of first refusal to the company's CEO for no consideration. C.A. No. 2022-0596-PAF, at 26–27 (Del. Ch. Jan. 31, 2024) (TRANSCRIPT). The Court accepted the plaintiff's argument that "if the ROFR had value, transferring it in

exchange for nothing diminished the company's assets," further noting that the "defendants' argument that the ROFR could not be transferred is belied by the fact that someone other than the company exercised it." *Id.* at 26. Here, by contrast, the Board did not transfer the ROFO to GES—the Board instead caused Shawville Power not to exercise the ROFO, and no one "other than the company exercised it." *Id.*

Plaintiffs contend that even if the ROFO itself was not transferred, "[a]t the very least, Shawville Power's ROFO provided Heritage the corporate opportunity to purchase the Shawville Plant, which it then gratuitously transferred to GenOn and GES by rejecting the ROFO." PAB at 42 n.17; *see also* Compl. ¶ 268 ("The transfer of the corporate opportunity to purchase the Shawville Plant from Shawville Power to GES constituted a fraudulent transfer . . . ."). But Shawville Power's decision not to pursue a corporate opportunity did not "transfer" any right, contractual or otherwise, to GES.

Plaintiffs further argue that even if "no specific party received the benefit" of the ROFO waiver, "a 'transfer' does not require assignability to a third party; it is sufficient that the debtor has relinquished a valuable right." PAB at 42. In other words, Plaintiffs suggest that dissipating or losing an asset can constitute a "transfer" under the DUFTA. I disagree. Section 1306(1)(b), which defines a transfer of an asset that is not real property, contemplates that a transfer will be made to a

24

"transferee." *See* 6 *Del. C.* § 1306(1)(b) ("A transfer is made . . . [w]ith respect to an asset that is not real property or that is a fixture, when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under this chapter that is superior to the interest *of the transferee*[.]" (emphasis added)). The DUFTA's remedial provisions also presuppose that a "transfer" is made to someone. Section 1307 identifies remedies available to creditors "[i]n an action for relief against a transfer or obligation" under the DUFTA, including avoidance of the transfer, an attachment against the transferred asset, an injunction against further disposition of the asset, or appointment of a receiver to take charge of the asset. 6 *Del. C.* § 1307(a). Section 1308 further addresses when a transfer is voidable against the recipient of assets in a transfer. 6 *Del. C.* § 1308. Each of these sections contemplates a transfer to a transferee, not mere dissipation of assets.[10]

Plaintiffs' pleading recognizes as much by asserting Count VIII against GES as the purported recipient of the fraudulent transfer and by attempting (unsuccessfully) to allege a transfer "to GES." *See* Compl. ¶ 260 (alleging the ROFO was transferred "to GES"); *id.* ¶ 267 (same); *id.* ¶ 268 (alleging a corporate

---

[10] The U.S. Court of Appeals for the Third Circuit reached a similar conclusion when interpreting a fraudulent conveyance statute in the U.S. Bankruptcy Code. *See In re Pazzo Pazzo, Inc.*, 2022 WL 17690158, at *3–4 (3d Cir. Dec. 15, 2022) (finding that terminating a lease and option was not a "transfer"). On the other hand, Plaintiffs have not identified any case in which a Delaware court has found a fraudulent transfer made without a transferee.

25

opportunity was transferred "to GES"); *id.* at 112 (seeking a declaration that "GenOn, SVSS IV, and Strategic Value Partners fraudulently transferred the corporate opportunity to purchase the Shawville Plant *to GES*") (emphasis added).

Because the Complaint fails to allege a transfer, Count VIII must be dismissed.

### D. Count IX Fails To State A Claim For Corporate Waste.

Count IX alleges that the Manager Defendants committed waste by "plundering [the] Heritage[] [Companies'] most valuable asset by affirmatively acting to waive the ROFO." PAB at 58.

"The standard for adequately pleading corporate waste is high and rarely satisfied." *Higher Educ. Mgmt. Gp., Inc. v. Mathews*, 2014 WL 5573325, at *11 (Del. Ch. Nov. 3, 2014). "To state a claim for waste, Plaintiff must plead that the [transaction] 'cannot be attributed to any rational business purpose.'" *Shabbouei v. Potdevin*, 2020 WL 1609177, at *13 (Del. Ch. Apr. 2, 2020) (quoting *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 750 (Del. Ch. 2016)). "A claim of waste will arise only in the rare, 'unconscionable case where directors irrationally squander or give away corporate assets.'" *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006) (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)).

The Complaint fails to adequately plead that the Board's decision to waive the ROFO lacked any rational business purpose. The Complaint alleges that

26

Heritage Power and its wholly owned subsidiary, Shawville Power, were insolvent. Compl. ¶ 104 ("For the close of the first quarter of 2022, Heritage Power reported consolidated assets of $539 million and consolidated liabilities of $630.7 million"); *id.* ¶ 106 ("By the end of the third quarter of 2022, Heritage Power's consolidated balance sheet . . . report[ed] assets of $532.4 million, and liabilities of $722.2 million"); *id.* ¶ 109 ("In their bankruptcy petitions, the Heritage Companies reported between $50 and $100 million of assets against $500 million to $1 billion in liabilities."). Although Plaintiffs argue that "Heritage entered bankruptcy with more than $50 million in assets, more than enough to fund $20 million to execute a value-accretive transaction," PAB at 38, this argument fails to support an inference that the Board lacked *any rational business purpose* for declining to use 40% of the Heritage Companies' assets to acquire the Shawville Plant while on the brink of bankruptcy. *See, e.g.*, *Calma v. Templeton*, 114 A.3d 563, 591 (Del. Ch. 2015) (finding a complaint "d[id] not plead . . . the rare type of facts from which it is reasonably conceivable that the [challenged stock awards] [we]re so far beyond the bounds of what a person of sound, ordinary business judgment would conclude is adequate consideration" to sustain a claim for waste); *Espinoza v. Zuckerberg*, 124 A.3d 47, 67 (Del. Ch. 2015) ("[E]ven if a plaintiff successfully raises questions concerning the fairness of" a transaction, "he does not necessarily succeed in pleading . . . corporate waste"); *In re The Student Loan Corp. Deriv. Litig.*, 2002 WL

27

75479, at *4 (Del. Ch. Jan. 8, 2002) ("Even under the notice pleading standard, the complaint does not state facts that suggest that the transactions complained of were so one-sided that the onerous waste standard is satisfied."); *see also Knight v. Miller*, 2022 WL 1233370, at *6 (Del. Ch. Apr. 27, 2022) ("In order to constitute waste, the [transaction] must be without business purpose. Based on the allegations, the cause of action is insufficiently pled.").

The Complaint fails to overcome the high bar to plead corporate waste. Accordingly, Count IX must be dismissed.

## III. CONCLUSION

For the reasons explained above, Counts I and II, Count III only to the extent it alleges breaches of the duty of candor, and Counts VIII and IX of the Complaint are dismissed. The remaining counts will be addressed in a subsequent ruling.